UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WESLEY ANDREW FOX,

      Petitioner,

v.                                 Case No. 8:20-cv-2687-WFJ-UAM

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Wesley Andrew Fox, a Florida prisoner, timely filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 and a supporting memorandum. (Docs. 1, 10). Respondent filed a response opposing the petition. (Doc. 11). Mr. Fox filed a reply. (Doc. 14). Upon consideration, the petition is **DENIED**.

## I.    Procedural History

Mr. Fox was charged by information with, among other offenses, five counts of robbery with a firearm. (Doc. 11-2, Ex. 8). One of the robbery counts was severed for trial, and a jury found Mr. Fox guilty as charged. (*Id.*, Ex. 19, at 674). The trial court sentenced him to thirty years' imprisonment with a mandatory minimum term of ten years. (*Id.*, Ex. 22). The state appellate court *per curiam* affirmed the conviction and sentence. *Fox v. State*, 195 So. 3d 377 (Fla. 2d DCA 2016). Mr. Fox unsuccessfully sought postconviction relief under Florida Rule of Criminal Procedure 3.850, (Doc. 11-2, Exs. 27, 30, 31, 32, 34), and

1

the state appellate court *per curiam* affirmed the denial of relief, *Fox v. State*, 287 So. 3d 526 (Fla. 2d DCA 2019). This federal habeas petition followed. (Doc. 1).

## II.    Facts; Trial Testimony

This case arises from Mr. Fox's robbery of a PNC Bank in St. Petersburg, Florida. On October 5, 2012, an undercover unit of the St. Petersburg Police Department was conducting surveillance outside the bank. (Doc. 11-2, Ex. 17, at 293-94). The surveillance was targeted at Mr. Fox, a suspect in a string of bank robberies in the area. (*Id.*, Ex. 18, at 546-49; *see also id.*, Ex. 27, at 21-22). The police had observed Mr. Fox driving around the PNC Bank on October 1 and 4, but he did not enter the premises on those days. (*Id.*, Ex. 18, at 546-48).

Around 5:00 p.m. on October 5, law enforcement saw Mr. Fox driving around the bank in an "evasive or unusual" way. (*Id.*, Ex. 17, at 294-95). After approximately forty-five minutes of "suspicious" driving, Mr. Fox parked outside an apartment building "just northeast of the bank." (*Id.* at 295; *id.*, Ex. 18, at 417-48). Wearing a long-sleeved shirt, a baseball cap, a backpack, and gloves, Mr. Fox exited the car and made his way to the bank. (*Id.*, Ex. 17, at 274; *id.*, Ex. 18, at 407-09). On the way, he encountered a woman "getting out of her car." (*Id.*, Ex. 18, at 408). He "turn[ed] his back" so that the woman would not "see him," waited until she "got out of his sight," and then turned around and resumed walking toward the bank. (*Id.* at 408-09).

Immediately before entering the bank, Mr. Fox concealed "the lower part of his face" with a "turtleneck." (*Id.* at 411). Once inside, he made "a beeline" toward a teller. (*Id.* at 412). The teller told Mr. Fox to take off his face covering; he refused, pointed a gun

at her, and told her to "give him the money in [her] drawer." (*Id.*, Ex. 15, at 239-40). The teller complied, giving Mr. Fox "all of the money" in the drawer, including "bait money" containing a GPS tracker. (*Id.* at 240). Mr. Fox noticed the bait money, threw it back at the teller, and told her to get "more money." (*Id.* at 240, 242). The teller retrieved "bundled" cash from the vault. (*Id.* at 242). Meanwhile, a second teller began "putting [her] cash up for him, including [her] bait." (*Id.*, Ex. 17, at 282). Once again, Mr. Fox took the cash and discarded the bait. (*Id.* at 283). He then left the bank, followed by a customer who told the second teller, "I got this." (*Id.* at 284-85).

Mr. Fox entered his car and threw his backpack and hat onto the front passenger seat. (*Id.*, Ex. 18, at 443). He had left the car unlocked with the keys in the ignition, but law enforcement "had taken the keys out of [the] ignition as soon as [they] heard he was robbing the bank." (*Id.*) Approximately ten officers approached the car and arrested Mr. Fox. (*Id.*, Ex. 17, at 301). Inside the backpack, law enforcement found a .380 semiautomatic handgun and $4,018 in cash. (*Id.* at 327; *id.*, Ex. 18, at 447, 451).

Mr. Fox testified at trial. He admitted to the robbery, claimed that he had used his military training to prepare for it, and explained that he was "in a very selfish frame of mind" when he committed the crime. (*Id.*, Ex. 18, at 508-11). Mr. Fox said he wanted the jury to "find me guilty because I'm guilty," but he requested that they "consider finding me guilty of a lesser charge"—that is, simple robbery rather than robbery with a firearm. (*Id.* at 530-31). In support, Mr. Fox claimed that he had carried the handgun "as a prop" and never intended to use it on anyone other than himself. (*Id.* at 531). During closing argument, Mr. Fox's counsel asked for "a verdict of a lesser included offense" and

criticized law enforcement for failing to stop the robbery before Mr. Fox entered the bank. (*Id.*, Ex. 19, at 624-28, 634-35).

## III.  Standards of Review

### A.  AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Mr. Fox's conviction and sentence, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B.      Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The

exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

## C.    Ineffective Assistance of Counsel

Mr. Fox alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of

professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Fox must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Mr. Fox must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

7

## IV.    Discussion

### A.    Ground One—Denial of Motion to Continue Trial

Mr. Fox contends that the trial court violated his rights under the federal constitution by denying his motion to continue the trial. (Doc. 1 at 5-7). Mr. Fox was charged by information in November 2012. (Doc. 11-2, Ex. 2). He was initially represented by a public defender. (*Id.*, Ex. 1, at 1). In September 2013, the court granted Mr. Fox's request to proceed *pro se*, and the case was set for trial on December 17, 2013. (*Id.* at 3). One week before trial, retained counsel entered a notice of appearance on behalf of Mr. Fox. (*Id.*, Ex. 6). Mr. Fox then bonded out of jail and absconded, failing to appear on the first day of trial. (*Id.*, Ex. 7; *id.*, Ex. 13, at 15). On January 3, 2014, Mr. Fox was arrested in South Carolina; he was extradited to Pinellas County two months later. (*Id.*, Ex. 21, at 57-58).

The court set a new trial date of August 19, 2014, holding several pretrial hearings in the interim. (*Id.*, Ex. 1, at 5). At the August 13 hearing, counsel indicated that Mr. Fox had agreed to resolve all five robbery charges by entering an open plea with a maximum of thirty years' imprisonment and a ten-year mandatory minimum. (*Id.*, Ex. 10, at 4-7). Before the hearing concluded, however, the prosecution discovered caselaw stating that the ten-year mandatory minimums for the five robbery charges "would have to be [run] consecutive[ly]" rather than concurrently. (*Id.* at 20-21). The court continued the hearing to allow the prosecutor to consult with the State Attorney about waiving the mandatory minimums. (*Id.* at 22-23).

Two days later, the court reconvened. Counsel for Mr. Fox reported that the State would not waive the mandatory minimums for the open plea. (*Id.*, Ex. 11, at 3). The State

did offer, however, to resolve all the robbery charges in exchange for a twenty-two-year sentence. (*Id.* at 3-4). Counsel indicated that Mr. Fox would not "accept 22 years," but stated that she would "revisit" the matter with him over the weekend. (*Id.*)

At the next hearing, on August 18, counsel informed the court that Mr. Fox was "not willing to accept the offer of 22 years right now." (*Id.*, Ex. 12, at 6). Counsel also asked the court to continue the trial, which was set to begin the next day. (*Id.*) Counsel argued that a continuance was appropriate because she was waiting on a "psychological evaluation" of Mr. Fox, which might reveal "mitigating circumstances" that could be "present[ed] [] to the State." (*Id.* at 6-8). The prosecution opposed a continuance, explaining that even if Mr. Fox's counsel obtained "the psychological records," "we may still be in a position where that's not going to make a difference because he's got five robberies." (*Id.* at 10-11). The court opined that the offer of twenty-two years' imprisonment was "a very good offer from the State," and informed Mr. Fox that he was "facing life on each one of [the robbery counts]." (*Id.* at 12). Mr. Fox confirmed that he was "not going to take the 22." (*Id.* at 13). The court then denied the request for a continuance. (*Id.*)

The next day, counsel indicated that she had filed "a formal written motion to continue based on the same reasons as yesterday." (*Id.*, Ex. 13, at 5). Counsel reiterated that she needed additional time to obtain a psychological evaluation of Mr. Fox. (*Id.* at 7-8). She also stated that there "were some issues" with the "GPS tracking warrant" for Mr. Fox's car, and that she had "prepared a brief motion to suppress" any evidence obtained as

9

a result of the GPS tracker.[1] (*Id.* at 8). The court ultimately declined to continue the trial. It noted that the trial would have taken place "in 2013" but for Mr. Fox's failure to appear "the morning of trial." (*Id.* at 15). The court observed that "it took months to get him back" from South Carolina and "months to reset the trial date," giving counsel "all the time you need to get prepared in any fashion you'd like." (*Id.* at 17). The court also found that a continuance was not justified based on "needing more time to present mental health mitigation when there isn't going to be a plea." (*Id.*) In short, the court denied a continuance based on "the history of the case"—*i.e.*, that Mr. Fox spent "almost two years in jail[,] and he left the State of Florida on what appeared to be the day before his trial. And then now it's taken almost a year later to have the case reset for trial." (*Id.* at 18).

Mr. Fox now contends that the denial of a continuance violated his "constitutional right to a fair trial." (Doc. 10 at 12). According to him, a continuance "would have allowed him to seek the psychological evaluation discussed by trial counsel and adequately prepare a legal defense to the charged offense." (*Id.* at 15). Counsel eventually obtained such an evaluation for sentencing, and it showed that Mr. Fox suffered from "1) Bipolar I Disorder—Severe with Psychotic Features; 2) Post Traumatic Stress Disorder [("PTSD")]; [and] 3) Adjustment Disorder with Mixed Disturbance of Emotions and Conduct." (*Id.*) Mr. Fox argues that these diagnoses "revealed that an affirmative defense of insanity would have been available to him." (*Id.*) He also appears to maintain that a psychological evaluation could have allowed him to seek "a better plea offer." (Doc. 14 at 2).

---

[1] Before the October 5 robbery, law enforcement had obtained a warrant to place a GPS tracking device on Mr. Fox's car. (Doc. 11-2, Ex. 18, at 394-95).

Respondent correctly contends that this claim is unexhausted. (Doc. 11 at 11-13). Proper exhaustion requires a petitioner to "make the state court aware that the claims asserted present federal constitutional issues." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007). "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). A petitioner must do more, however, than "scatter some makeshift needles in the haystack of the state court record." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). Moreover, a petitioner "does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief" to find the "federal claim." *Baldwin*, 541 U.S. at 32.

Mr. Fox failed to squarely present his federal constitutional claim on direct appeal. In his initial brief, he argued that "[t]he trial court abused its discretion when it failed to grant [his] motion for continuance prior to the commencement of trial." (Doc. 11-2, Ex. 24, at 13). But Mr. Fox did not contend that the denial of a continuance violated any right under the federal constitution. Nor did he cite any provision of the federal constitution. Instead, Mr. Fox couched his argument entirely in terms of Florida law governing continuances in criminal cases. (*Id.* at 13-22). The only federal case Mr. Fox cited was *Santobello v. New York*, 404 U.S. 257 (1971), but he relied on that decision solely for the proposition that "the plea process is a critical stage of [the] proceedings and its importance cannot be understated." (*Id.* at 19-20). *Santobello* did not address the constitutional

implications of denying a continuance in a criminal case; it held only that when guilty pleas "rest in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled." 404 U.S. at 262. Accordingly, Mr. Fox failed "to afford the state courts a meaningful opportunity to consider" his federal constitutional claim. *McNair*, 416 F.3d at 1302.

Mr. Fox cannot return to state court to present his unexhausted claim in a second, untimely direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within thirty days of the rendition of a sentence). As a result, Ground One is procedurally defaulted. *See Smith*, 256 F.3d at 1138 ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."). And because Mr. Fox has not shown that an exception applies to overcome the default, Ground One is barred from federal habeas review.

Even if Mr. Fox had exhausted this claim, he would not be entitled to relief. "[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983). "[T]o establish that a denial of a continuance was reversible error, a defendant must show that the denial caused specific substantial prejudice." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1326 (11th Cir. 2002); *see also United States v. Saget*, 991 F.2d 702, 708 (11th Cir. 1993) (explaining that the "[d]enial of a continuance, requested by a defendant in order

12

to permit additional preparation for trial, must be upheld unless the defendant can show an abuse of discretion and specific, substantial prejudice"). To show prejudice, a defendant must establish at least "the possibility of a different outcome if [he] had been given [] additional [time] to prepare for trial." *United States v. Gossett*, 877 F.2d 901, 906 (11th Cir. 1989).

The denial of Mr. Fox's request for a continuance cannot be considered "unreasoning" or "arbitrary." *Morris*, 461 U.S. at 11. Over the course of two hearings, the trial court heard extensive argument from the parties concerning the requested continuance. The court ultimately gave a detailed explanation of its decision to deny the continuance, emphasizing that (1) the case had been pending for almost two years, (2) the trial would have taken place "in 2013" but for Mr. Fox's failure to appear "the morning of trial," and (3) counsel had several months after Mr. Fox was apprehended in South Carolina to "get prepared in any fashion" she needed. (Doc. 11-2, Ex. 13, at 15, 17-18). In these circumstances, there is no basis to disturb the "broad discretion" afforded the trial court on matters of continuances. *Morris*, 461 U.S. at 11.

Mr. Fox also fails to show that the denial of a continuance "caused specific substantial prejudice." *Van Poyck*, 290 F.3d at 1326. Mr. Fox contends that additional time to prepare for trial would have allowed him to obtain a psychological evaluation showing that he suffered from bipolar disorder, PTSD, and adjustment disorder. (Doc. 10 at 15). According to Mr. Fox, these diagnoses could have supported an insanity defense. (*Id.*) But there is no basis to conclude that Mr. Fox was insane at the time of the robbery.

Under Florida law, a defendant pursuing an insanity defense bears the burden of proving, by "clear and convincing evidence," that because of a mental defect, he either "[d]id not know what he . . . was doing or its consequences," or, if he knew what he was doing and its consequences, that he "did not know that what he . . . was doing was wrong." Fla. Stat. § 775.027. To be sure, Mr. Fox experienced mental-health issues. But he presents no evidence that his mental illnesses rendered him unable to distinguish right from wrong, or to know what he was doing and its consequences. "[M]ental illness that does not result in insanity, as defined [by Florida law], is not a defense." *Perez v. State*, 306 So. 3d 126, 130 n.1 (Fla. 2d DCA 2018). Moreover, Mr. Fox testified at trial that he methodically planned the robbery using his military training, and that "at the end of the day," he knew "what's right and wrong." (Doc. 11-2, Ex. 18 at 526). In these circumstances, there is no possibility that "a jury would have found by clear and convincing evidence that [Mr. Fox] met the insanity standard at the time of the charged offenses." *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1211 (11th Cir. 2021).

Likewise, Mr. Fox fails to show that a psychological evaluation would have enabled him to negotiate a better plea offer from the State. He presents no evidence that such an evaluation would have persuaded the State to improve on its offer of twenty-two years' imprisonment for all five robbery charges. Mr. Fox's speculation about the possibility of a better offer is "insufficient to carry the burden of a habeas corpus petitioner." *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001). Furthermore, the prosecutor expressed skepticism about the utility of a psychological evaluation, stating that even if Mr. Fox's counsel obtained "the psychological records," "we may still be in a position where that's

not going to make a difference because he's got five robberies." (Doc. 11-2, Ex. 12, at 10-11). For all these reasons, Mr. Fox cannot show "specific substantial prejudice" from the denial of a continuance. *Van Poyck*, 290 F.3d at 1326.

## B.     Ground Two, Sub-Claim A—Alleged *Brady* Violations

Mr. Fox argues that the prosecution violated *Brady*[2] by failing to turn over two pieces of allegedly exculpatory evidence: (1) a Florida Department of Law Enforcement ("FDLE") report showing that "lab technicians were not able to successfully fire the recovered firearm without first modifying the weapon, *i.e.*, swapping out the broken firing pin"; and (2) a tape recording "created by the undercover St. Petersburg officers of their radio transmissions amongst each other on the day of [Mr. Fox's] arrest." (Doc. 1 at 8). The Court considers each piece of evidence in turn.

### 1.     The FDLE Report

Mr. Fox alleges that, shortly after his arrest, the gun he used to commit the robbery was "sent to the FDLE lab for testing." (Doc. 11-2, Ex. 27, at 12 n.4). According to Mr. Fox, lab technicians were unable to fire the gun without "swapping out the broken firing pin." (*Id.* at 14). This meant that "the firearm as it was used during the robbery was inoperable." (*Id.*) Mr. Fox alleges that the prosecution violated its *Brady* obligations by failing to disclose the report until March 2016—well after trial and sentencing in this case. (*Id.* at 12 n.4).

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

The state postconviction court rejected this claim. It held that the evidence was "not material" because "whether or not the firearm [Mr. Fox] used during the bank robbery was in working condition [was] immaterial to [his] case." (*Id.*, Ex. 30, at 4). Citing Florida law, the court explained that "[a] gun that does not have any firing pin is [a] 'firearm' for purposes of [the] offense of robbery with a firearm." (*Id.* at 4 (citing *Blackmon v. State*, 696 So. 2d 918 (Fla. 1st DCA 1997)). Thus, "[u]nder the statutory definition of 'firearm,' operability is not a determinative factor." (*Id.* (citing Fla. Stat. § 790.001(9)). The court likewise rejected Mr. Fox's argument that the report "could have been used to impeach testimony that the pin was removed for safety reasons at trial." (*Id.*) The court noted that "[t]here was no specific testimony that the firing pin was operational which could be impeached with specific testimony that it was not." (*Id.* at 5). As a result, Mr. Fox "fail[ed] to show that the evidence alleged to have been suppressed was exculpatory or impeaching or that he was prejudiced." (*Id.*)

The rejection of this claim was reasonable. "To prevail on a *Brady* claim, the defendant must establish: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the defendant incurred prejudice." *Wright v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1256, 1278 (11th Cir. 2014). "The prejudice or materiality requirement is satisfied if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 746 (11th Cir. 2010). "The question is not whether the defendant would more likely than not have received a different

verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1316 (11th Cir. 2005).

Mr. Fox's *Brady* claim fails because there is no "reasonable probability that, had the [FDLE report] been disclosed to the defense, the result of the proceeding would have been different." *Allen*, 611 F.3d at 746. Mr. Fox went to trial on one count of robbery with a firearm. For purposes of that offense, a "firearm" "means any weapon (including a starter gun) which will, is designed to, or may readily be converted to expel a projectile by the action of an explosive." Fla. Stat. § 790.001(9). Interpreting this language, Florida courts have held that "a finding that a handgun [is] operational" is not required "in order to uphold a conviction of robbery with a firearm." *Ahlberg v. State*, 541 So. 2d 775, 775 (Fla. 3d DCA 1989) (citing *Bentley v. State*, 501 So. 2d 600, 602 (Fla. 1987)); *see also Watson v. State*, 437 So. 2d 702, 705 (Fla. 4th DCA 1983) ("[T]he legislature did not intend to require a finding that an operable handgun be involved in order to sustain a conviction of robbery with a firearm."). Thus, even if Mr. Fox had been able to present evidence that the gun was inoperable on the day of the robbery, there is no reasonable probability that the outcome of his trial would have been different.

Likewise, Mr. Fox cannot show that the FDLE report was material as impeachment evidence. Detective Rich Shaw described Mr. Fox's gun for the jury, explaining that the "gun [was] safe because the firing pin ha[d] been removed." (Doc. 11-2, Ex. 18, at 449-50). Mr. Fox contends that the FDLE report could have been used to impeach Detective Shaw by establishing that "it was unnecessary to remove [the] firing pin as the firing pin

was broken, rendering the weapon inoperable and perfectly safe." (*Id.*, Ex. 27, at 14-15). Even assuming that Detective Shaw could have been impeached on this minor point, the *Brady* claim still fails for lack of prejudice. Setting aside Detective Shaw's testimony, the jury was presented with "overwhelming evidence of [Mr. Fox's] guilt in the robber[y] for which he was tried." *United States v. Gilmore*, 833 F. App'x 790, 798 (11th Cir. 2020). That evidence included testimony from several other law enforcement officers and Mr. Fox's detailed confession to the crime. Thus, the state postconviction court reasonably rejected the *Brady* claim based on the FDLE report.

### 2.      Recording of Police Radio

Mr. Fox separately contends that the prosecution violated *Brady* by failing to disclose "a tape recording created by the undercover St. Petersburg officers of their radio transmissions amongst each other on the day of [his] arrest." (Doc. 1 at 8). According to Mr. Fox, the recording "would have been used by the [d]efense to establish that no officer ever actually saw [him] with a weapon on the date of the robbery." (Doc. 11-2, Ex. 27, at 16). Instead, law enforcement "saw [Mr. Fox] approach the bank, pull some sort of cloth up around his face, and enter the bank." (*Id.* at 16-17). Mr. Fox argues that the recording is relevant "because Detective Shaw, the unit leader, testified that 'a detective' did call out that [Mr. Fox] was armed and was 'waving a pistol around'" inside the bank. (*Id.* at 17). Thus, Mr. Fox maintains, the recording would have called into question "the probable cause for the arrest and the search" by establishing that law enforcement did not see him carrying a weapon during the robbery. (*Id.*)

The state postconviction court rejected this claim. As an initial matter, the court found that Mr. Fox "fail[ed] to establish that the alleged tape [was] exculpatory or impeaching" because he merely "speculat[ed] as to the contents of the tape." (*Id.*, Ex. 30, at 6). The court further held that, "even if the tape does exist, was suppressed either willfully or inadvertently, and indicates that [Mr. Fox] was not seen with a firearm by officers on the day of the robbery," the *Brady* claim still failed because Mr. Fox could not "establish that [the recording] would have affected the outcome of the trial." (*Id.*) The court explained that "there was probable cause to detain [Mr. Fox] for the bank robbery regardless of whether officers saw him with the gun." (*Id.*) The court noted that, "[i]n addition to Detective Shaw, there were up to 15 other police officers in the area, in cars and on foot, surveilling the red Toyota Corolla, [Mr. Fox], and the PNC [B]ank." (*Id.*) As the court stated, Mr. Fox "was seen walking toward the bank in a suspicious manner with both hands in his pockets and avoiding other people," and he "was wearing a long-sleeved shirt with a turtleneck or scarf on a warm day, a baseball cap pulled down low, sunglasses, and a backpack." (*Id.* at 7). When Mr. Fox entered the bank, "he pulled up the turtleneck or scarf so as to obscure the bottom of his face," then "made a beeline for the teller line." (*Id.*) "At that point," the court recounted, "the officers were convinced that a robbery was about to take place but did not intervene because their training and experience told them that if they attempted to stop the robbery in progress it could result in a hostage situation." (*Id.*) The court went to explain that Mr. Fox was "seen running out of the bank, pulling down his turtleneck or scarf away from his face, [and] being chased by a patron from the

bank." (*Id.*) One of the officers on the scene "ran across the street to further confirm the robbery and that the people in the bank were okay." (*Id.*)

Citing this testimony, the court found that "[e]ven if an 'armed' robbery had not been called out and officers had not removed the keys from [Mr. Fox's] vehicle, [he] could and would still have been detained." (*Id.*) In support, the court noted that "[i]t was clear to the officers that a robbery was taking place and they had positioned their vehicles to block [Mr. Fox's] exit." (*Id.*) Thus, the court concluded that "the tape was not material and [Mr. Fox] was not prejudiced because it would not have changed the outcome of the trial." (*Id.* at 7-8).

The rejection of this claim was reasonable. Mr. Fox argues that, had he been able to present the recording at trial, he could have proven that "no officer ever actually saw [him] with a weapon on the date of the robbery." (*Id.*, Ex. 27, at 16). According to Mr. Fox, this would have shown that law enforcement lacked probable cause to arrest him and search his vehicle. (*Id.* at 16-17). This argument lacks merit.

First, as the state postconviction court correctly noted, Mr. Fox offers nothing beyond his own speculation to establish the content of the recording. For example, he does not claim to have recovered a copy of the tape. Mere speculation about the content of allegedly suppressed evidence is insufficient to establish a *Brady* violation. *See United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011) ("[Defendant's] argument fails for a second reason: *Brady* applies only to exculpatory and impeachment evidence, and [defendant's] argument that the report contains exculpatory information is, at best, speculative."); *see also Runningeagle v. Ryan*, 686 F.3d 758, 771 (9th Cir. 2012) ("As

[defendant] can only speculate as to what [his co-defendant's former cellmate] told prosecutors, [defendant] cannot demonstrate that [the alleged] statements were exculpatory or useful for impeachment, or that there is a reasonable probability that had [the] statements been disclosed, the outcome of the trial or of the sentencing would have been different.").

Second, even accepting Mr. Fox's speculation about the content of the recording, it does not follow that law enforcement lacked probable cause to arrest him or search his vehicle. Probable cause to arrest exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). Likewise, probable cause to search a vehicle "exists when there is a fair probability that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances." *United States v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011). Even if law enforcement did not see Mr. Fox brandish a gun during the robbery, the police had ample probable cause to believe that (1) he robbed the PNC Bank and (2) the car in which he attempted to flee contained evidence related to the robbery. As the state postconviction court recounted, Mr. Fox's actions made it "clear to the officers that a robbery was taking place." (Doc. 11-2, Ex. 30, at 7). Because the recording would not have called into question the lawfulness of the arrest or search, Mr. Fox fails to establish "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Allen*, 611 F.3d at 746.

Thus, the state postconviction court reasonably rejected the *Brady* claim based on the recording. Ground Two, Sub-Claim A is denied.

### C.   Ground Two, Sub-Claim B—Failure to Raise Alleged Discovery Violation Related to Recording of Police Radio

Mr. Fox contends that trial counsel was ineffective for neglecting to raise an alleged "discovery violation"—specifically, the prosecution's failure to turn over the recording of radio transmissions between law enforcement during the robbery. (Doc. 1 at 8; *see also* Doc. 11-2, Ex. 27, at 18). According to Mr. Fox, had counsel raised this alleged "discovery violation," "the outcome of the proceeding would have been different because the [c]ourt would have granted a mistrial and ordered for [him] to have a new trial, based on the undisclosed evidence." (Doc. 11-2, Ex. 27, at 18).

The state postconviction court rejected this claim on the grounds that Mr. Fox "fail[ed] to show that counsel was deficient for failing to move for a mistrial and [] fail[ed] to show that he was prejudiced." (*Id.*, Ex. 30, at 8). As to deficient performance, the court noted that counsel's "strategy . . . was to show that police knew a robbery was about to take place and could have prevented the robbery but did not." (*Id.*) In the court's view, an "audio tape" that undercut "Detective Shaw's testimony that the police knew an armed robbery was occurring would be contrary to the [d]efense strategy." (*Id.*) As to prejudice, the court reiterated that "there was an overwhelming amount of evidence of [Mr. Fox's] guilt presented at trial." (*Id.*) The court summarized that evidence as follows: "After the officers heard the call out that a robbery had occurred they observed [Mr. Fox] running

22

from the bank and [Mr. Fox], the man the officers saw enter the bank, was apprehended with the money from the bank and the firearm." (*Id.*)

The rejection of this claim was reasonable. In addition to the reasons given by the state court, the ineffective-assistance claim fails because it rests entirely on Mr. Fox's unsupported speculation about the content of the recording. *See Johnson*, 256 F.3d at 1187 ("[S]peculation is insufficient to carry the burden of a habeas corpus petitioner."). Again, Mr. Fox points to no evidence about what the recording would have revealed. Absent such information, there is no basis to conclude that the prosecution violated its discovery obligations by failing to disclose the tape. *See, e.g.*, *Guy v. State*, 287 So. 3d 620, 625-26 (Fla. 4th DCA 2019) ("A trial court is not required to conduct [] a hearing [concerning alleged discovery violations] where no discovery violation has occurred."). Because there is no evidence that a discovery violation occurred, the Court cannot find that counsel was deficient for neglecting to challenge the prosecution's failure to disclose the tape. Thus, the state postconviction court acted reasonably in rejecting this claim. Ground Two, Sub-Claim B is denied.[3]

### D.    Ground Three, Sub-Claim A—Advising Mr. Fox to Testify

Mr. Fox contends that trial counsel was ineffective for advising him to testify at trial. (Doc. 1 at 10). At the beginning of trial, counsel sought to suppress "any information concerning the GPS tracker" that law enforcement had installed on his car. (*Id.*) The

---

[3] To the extent that Mr. Fox asserts an ineffective-assistance claim based on counsel's failure to object to the non-disclosure of the FDLE report, that claim is procedurally defaulted because it was not raised in state court. Mr. Fox offers no basis to excuse the default of this claim.

prosecution agreed that "not a single State witness [would] testif[y] about the fact that a tip led to a GPS tracker being installed on [Mr. Fox's] car." (*Id.*) According to Mr. Fox, "as the trial progressed," counsel "realized that she did want to question law enforcement about their actions leading up to the robbery because she wanted to point them out as the 'bad guys' who let a robbery take place, even though they knew about it beforehand." (*Id.*) Mr. Fox alleges that "trial counsel realized there was only one way to get testimony in about the GPS"—that is, by having Mr. Fox "take the stand and admit to his involvement in the robbery so it would open the door for testimony about law enforcement tracking him." (*Id.*) Mr. Fox argues that he "took the stand" as a result of a counsel's allegedly deficient advice. (*Id.* at 11).

The state postconviction court rejected this claim for lack of prejudice, explaining that there was "no reasonable probability that the jury would have found [Mr. Fox] not guilty or that the outcome of the trial would have been different if [he] did not testify based on the overwhelming evidence of guilt." (Doc. 11-2, Ex. 30, at 15). The court noted that "[t]he entire bank robbery was witnessed by a number of law enforcement officers and the victims of the robbery, as well as a video that captured [Mr. Fox] committing the crime." (*Id.*) The court went on to give a detailed summary of the testimony and exhibits presented at trial. (*Id.* at 15-17). Citing "the totality of the evidence introduced at trial"—"including testimony of the two bank tellers, the other bank employee, and seven law enforcement officers, together with the physical evidence, including surveillance video, photographs, [Mr. Fox's] clothes, sunglasses, and backpack, and the firearm"—the court found it "clear

that there was overwhelming evidence of [Mr. Fox's] guilt without his testimony." (*Id.* at 17).

The rejection of this claim was reasonable. To show prejudice under *Strickland*, Mr. Fox must "establish a reasonable probability that, but for counsel's [advice to testify], the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). Mr. Fox cannot make this showing because, even apart from his trial testimony, the prosecution presented overwhelming evidence of his guilt. *See Lembrick v. Sec'y, Fla. Dep't of Corr.*, No. 3:16-cv-47-TJC-JRK, 2018 WL 5830535, at *6 (M.D. Fla. Nov. 7, 2018) ("Considering this substantial evidence of guilt, [petitioner] cannot show that but for his trial testimony, the outcome of the trial would have been different."). Because Mr. Fox "so clearly fails to satisfy the prejudice prong," the Court "need not decide whether counsel's performance was in fact deficient." *Grayson v. Thompson*, 257 F.3d 1194, 1225 (11th Cir. 2001). Ground Three, Sub-Claim A is denied.

### E.   Ground Three, Sub-Claim B—Alleged Misadvice About Consequences of Testifying

Relatedly, Mr. Fox contends that trial counsel misadvised him about the consequences of testifying at trial. (Doc. 1 at 11). Counsel allegedly told Mr. Fox:

> As long as you do not take the stand in a different proceeding, they will not be allowed to use this statement outside of this trial. Now, if you do take the stand in a different trial and they were to ask you, for instance, if you had robbed a bank before, and you said 'no,' then they could introduce your statement from this trial to impeach you in a way or to contradict your testimony that you hadn't robbed a bank before. But, if you took the stand in a different trial and told the same story as today, then they wouldn't be able to introduce it. . . . . Yeah, as long as you don't take the stand in another trial, they won't be able to use it.

(*Id.*) Mr. Fox contends that he "took the stand" based on this erroneous advice. (*Id.*)

The state postconviction court held an evidentiary hearing on this claim. (Doc. 11-2, Ex. 33). Mr. Fox and his counsel testified at the hearing. (*Id.*) The court summarized their testimony as follows:

> [Mr. Fox] testified that he hired [counsel] to represent him in December, 2013, that he bonded out, but left the State without permission and was later returned to Florida. He stated that there was an FBI agent present in the courtroom at his August, 2014 trial and he was concerned because there had been previous discussions about whether the federal government would prosecute the bank robberies. [Mr. Fox] explained that he also had charges pending in Pasco County. He stated that he asked counsel if "they" could use his testimony against him in future proceedings and counsel responded that his testimony could be used to impeach him but could not otherwise be used because it would be using his own prior testimony against him.

> [Counsel] testified that she represented [Mr. Fox] at his trial on count one, and that she and [Mr. Fox] spoke about whether any testimony [he] gave at trial could be used against him in the future. She stated that she advised him that his testimony could be used to impeach him at future trials, at a re-trial of count one if it were reversed on appeal, and under other circumstances. She stated that she did not tell him his testimony could not be used against him in other cases. [Counsel] testified that she gave [Mr. Fox] no advice regarding related Pasco County charges because she did not have the discovery for those cases and she did not know any of the details of the charges. As far as federal charges [counsel] indicated that the State had told her that the federal government agents were not looking to pick up the case but early on in her representation she discussed with [Mr. Fox] the possibility of federal government prosecution and she relayed all information she received from the State to [him]. She reiterated that she told [Mr. Fox] his testimony could be used against him but she did not detail every situation where it could be used because she did not know the details of the other counts and cases.

(*Id.*, Ex. 34, at 3).

The court ultimately rejected Mr. Fox's claim, finding that he "fail[ed] to establish that counsel was deficient or that he was prejudiced." (*Id.* at 4). The court credited counsel's

statement that "she told [Mr. Fox] that his testimony could be used in all future proceedings, even if he did not testify." (*Id.*) According to the court, "[c]ounsel's testimony was largely consistent with [Mr. Fox's] own testimony that counsel explained various specific, but not all, scenarios where his testimony could or could not be used against him." (*Id.*) The court also held that Mr. Fox was not prejudiced in light of the "overwhelming evidence that [he] committed the armed robbery charged in count one, notably that he was caught coming out of the PNC [B]ank with a gun and banded money from the bank." (*Id.*) The court concluded that Mr. Fox "fail[ed] to demonstrate that his decision whether or not to testify would have changed the outcome of his trial on count one. He only demonstrate[d] that his testimony on count one might possibly change the outcome of some future conceivable trial on other charges." (*Id.*)

The rejection of this claim was reasonable. The state postconviction court credited counsel's testimony concerning her discussions with Mr. Fox about the consequences of testifying. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). Mr. Fox has not shown by "clear and convincing evidence" that the state court's credibility determination was erroneous. 28 U.S.C. § 2254(e)(1). To the contrary, the court accurately summarized the testimony from the evidentiary hearing and gave a reasoned explanation of its decision to credit counsel's version of events. Having determined that counsel advised Mr. Fox that "his testimony could be used in all future proceedings[] even if he did not testify," the court had no basis to find that counsel performed deficiently. (Doc. 11-2, Ex. 34, at 4).

27

Moreover, the state postconviction court reasonably concluded that Mr. Fox was not prejudiced because, even apart from his trial testimony, the jury was presented with overwhelming evidence of his guilt. *See Syed v. United States*, No. 1:13-CR-061, 2018 WL 4494202, at *16 (S.D. Ga. July 6, 2018) ("[B]ecause the weight of the evidence presented during the government's case in chief was overwhelming, Petitioner cannot show prejudice based on whatever evidence came out during his testimony that would not have come out otherwise."), *adopted by* 2018 WL 3738222 (S.D. Ga. Aug. 7, 2018). In addition, Mr. Fox does not allege that his trial testimony was used against him in any subsequent proceeding. Because the court reasonably applied *Strickland* in rejecting Mr. Fox's ineffective-assistance claim, Ground Three, Sub-Claim B is denied.

## F. Ground Four—Failure to "Timely File an Adequate Motion to Suppress"

Mr. Fox contends that trial counsel was ineffective for failing to "timely file an adequate motion to suppress" any evidence obtained as a result of the GPS tracker installed on his car. (Doc. 1 at 13). As noted above, one week before the August 19, 2014 trial date, counsel indicated that Mr. Fox had agreed to resolve all five robbery charges by entering an open plea with a maximum of thirty years' imprisonment and a ten-year mandatory minimum. (Doc. 11-2, Ex. 10, at 4-7). That deal fell apart, however, when the prosecution realized that the ten-year mandatory minimums for the five robbery charges "would have to be [run] consecutive[ly]" rather than concurrently. (*Id.* at 20-21). Although the State subsequently offered to resolve all pending charges in exchange for twenty-two years' imprisonment, Mr. Fox refused to accept that offer. (*Id.*, Ex. 11, at 3-4; *id.*, Ex. 12, at 6).

At that point, counsel moved to continue the trial. (*Id.*, Ex. 12, at 6). Counsel explained that, before she was retained, Mr. Fox had been "in a trial posture." (*Id.*, Ex. 13, at 7). Mr. Fox decided to pursue a plea, however, after "a long discussion" with counsel about "the possibilities of presenting a package to the State." (*Id.*) Counsel noted that "there [were] some issues with the GPS tracking warrant," and that she had "prepared a brief motion to suppress on that [issue]." (*Id.* at 8). Counsel stated, however, that she had "not done that before" because, "[w]hen negotiating with the State, preparing motions and filing motions is not usually the practice that you do when you're trying to work out a case or get them to look at any sort of plea offer that you're making to them." (*Id.* at 8-9). The court declined to continue the trial. (*Id.* at 15).

Immediately after jury selection, counsel indicated that "we need to address the GPS warrant situation." (*Id.*, Ex. 15, at 216). The prosecutor confirmed that he would not "talk about the GPS" during trial. (*Id.*) Specifically, he represented that the State would "limit [the testimony] to the officers' observations on" the day of the robbery and refrain from eliciting any testimony about the "GPS issue." (*Id.* at 217). The court said, "That sounds like it takes care of that issue." (*Id.* at 218). Counsel responded, however, that "we could argue that but for that GPS tracking device, they [*i.e.*, law enforcement] wouldn't have even been there" on the day of the robbery. (*Id.* at 220). When the court pointed out that counsel had yet to file a written motion to suppress, counsel stated that she was "moving orally to suppress it because I haven't had a chance to file one because of the situation with—I can't file a motion to suppress and make plea negotiations at the same time." (*Id.*)

The next day, counsel filed a written motion to suppress, "request[ing] that the GPS tracking warrant be suppressed and any evidence as a result of the tracking device be suppressed with it." (*Id.*, Ex. 16). Counsel argued that "[t]here was not sufficient evidence to establish probable cause to obtain a search warrant or GPS tracking warrant." (*Id.* at 69). Specifically, counsel maintained that the warrant application contained "material mistakes," including an alleged misstatement concerning the clothing worn by a suspect during an earlier robbery. (*Id.*) Counsel reiterated to the court that she had not filed the motion to suppress earlier because "we were in plea negotiations." (*Id.*, Ex. 17, at 278). The court declined to rule on the motion, reasoning that "[w]e [] already addressed the issue." (*Id.*)

In his federal habeas petition, Mr. Fox argues that counsel was deficient for "wait[ing] until the thirteenth hour" to file a "late" motion to suppress. (Doc. 10 at 21). The state postconviction court rejected this claim. (Doc. 11-2, Ex. 30, at 10). It noted that, under Florida law, "a motion to suppress" must typically be made "before trial," but "the court in its discretion may entertain the motion or an appropriate objection at trial." (*Id.* (citing Fla. R. Crim. P. 3.190(g)(4)). As the court explained, "[a]lthough counsel did not file the motion to suppress until the second day of trial she indicated to the [c]ourt on three separate occasions that the motion could not have been filed sooner because she had been in negotiations with the State and that it was not the practice in this Circuit to file motions to suppress while trying to negotiate a favorable disposition." (*Id.*) In short, "counsel filed the motion to suppress, explained to the [c]ourt why it could not be filed before the start of trial, and requested a hearing." (*Id.*) Although the court declined to "hear the motion," the

*Strickland* claim failed because counsel "was not deficient" in her handling of the motion to suppress. (*Id.*)

The rejection of this claim was reasonable. A strategic decision by counsel "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). "Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020). Accordingly, to prevail on his ineffective-assistance claim, Mr. Fox "would have to show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Id.*

Mr. Fox fails to overcome the "doubly deferential" standard of review required by *Strickland* and AEDPA. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). A reasonable jurist could conclude that counsel was not deficient in her handling of the motion to suppress. Counsel repeatedly stated that she made a strategic decision to refrain from filing a motion to suppress during plea negotiations. That decision rested on counsel's belief that "[w]hen negotiating with the State, preparing motions and filing motions is not usually the practice that you do when you're trying to work out a case or get them to look at any sort of plea offer that you're making to them." (Doc. 11-2, Ex. 13, at 8-9). Once plea negotiations fell apart, counsel moved to suppress any evidence obtained as a result of the GPS tracker and sought a continuance of the trial. Although the court ultimately refused to continue the trial and declined to consider counsel's written motion to suppress, a reasonable jurist could

conclude that counsel's approach was not "so patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). Thus, the state postconviction court reasonably concluded that counsel was not deficient in her presentation of the motion to suppress. *See Branch v. Sec'y, Fla. Dep't of Corr.*, No. 4:20-cv-441-WS-MJF, 2022 WL 1215310, at *9 (N.D. Fla. Mar. 10, 2022) (holding that state court reasonably rejected *Strickland* claim because "trial counsel made a strategic decision not to file a motion to suppress after balancing the likelihood of success and the risk of jeopardizing the favorable plea offer"), *adopted by* 2022 WL 1212151 (N.D. Fla. Apr. 25, 2022); *United States v. Conn*, No. CR 15-288, 2018 WL 3241048, at *5 (E.D. La. July 3, 2018) ("If [defendant's] attorney had filed a motion to suppress, it may have jeopardized the favorable plea agreement that was negotiated. This is the type of informed strategic decision that is entitled to deference and does not constitute ineffective assistance of counsel.").

Ground Four is denied.

### G.    Ground Five—Failure to "Timely and Adequately" Seek Continuance

Mr. Fox contends that trial counsel provided ineffective assistance by waiting until August 18, 2014—the day before trial—to move for a continuance. (Doc. 1 at 15-16). One week before trial, the parties' plea deal fell apart when the prosecution realized that the ten-year mandatory minimums for the five robbery charges "would have to be [run] consecutive[ly]" rather than concurrently. (Doc. 11-2, Ex. 10, at 20-21; *see also id.*, Ex. 11, at 3). On August 15, 2014—two days after this discovery—the prosecution indicated that it had made a new offer: resolution of all pending charges in exchange for twenty-two

years' imprisonment. (*Id.*, Ex. 11, at 3-4). Counsel for Mr. Fox stated that he would not "accept 22 years," but that she would "revisit" the matter with him over the weekend. (*Id.*) On August 18, counsel informed the court that she had "gone over things" with Mr. Fox, and he was "not willing to accept the offer of 22 years right now." (*Id.*, Ex. 12, at 6). Counsel then moved for a continuance of the trial, which was ultimately denied. (*Id.* at 6-7; *id.*, Ex. 13, at 15).

In his federal habeas petition, Mr. Fox argues that counsel "should have requested a continuance on Friday August 15th" rather than "Monday August 18th." (Doc. 1 at 16). According to Mr. Fox, counsel "did not immediately advise the trial court that [she] needed a continuance because [she] was not prepared for trial." (*Id.*) He also asserts that, "[h]ad trial counsel requested a continuance when she became aware the plea bargain had failed, and advised the [c]ourt about why she was not prepared to proceed to trial the following Monday, there is a reasonable probability that the [c]ourt would have granted that continuance." (Doc. 11-2, Ex. 27, at 30).

The state postconviction court rejected this claim. It explained that "[c]ounsel requested a continuance of [Mr. Fox's] trial at the first available time when it became clear that plea negotiations were no longer viable." (*Id.*, Ex. 30, at 12). According to the court, [c]ounsel had no reason to ask for a continuance until the day before trial [*i.e.*, August 18] when the plea negotiations failed." (*Id.*) At that point, "[c]ounsel immediately asked for a continuance, submitted a written motion the following day, and gave reasons for the continuance." (*Id.*) The trial court "denied the motion based on the age of the case, the number of previously scheduled trial dates, and the fact that [Mr. Fox] fled the

jurisdiction." (*Id.*) According to the state postconviction court, "[i]t is entirely speculative that the [trial] [c]ourt would have granted the motion to continue had it been presented on the Friday before trial instead of the Monday before trial." (*Id.*) Because "[s]peculation cannot form the basis for postconviction relief," the court found that Mr. Fox "fail[ed] to show that counsel was deficient" for waiting until August 18 to move for a continuance. (*Id.*)

The rejection of this claim was reasonable. Counsel was not deficient for moving to continue the trial on August 18 rather than August 15. As of August 15, counsel did not believe Mr. Fox would accept the State's new offer of twenty-two years' imprisonment, but she indicated that she would "revisit" the matter with him over the weekend. (*Id.*, Ex. 11, at 3-4). Counsel confirmed that Mr. Fox would not accept the offer, and she moved for a continuance when the court reconvened on August 18. (*Id.*, Ex. 12, at 6-7). A reasonable jurist could conclude that counsel's approach—that is, waiting to seek a continuance until after Mr. Fox definitively rejected the State's latest offer—was not "so patently unreasonable that no competent attorney would have chosen it." *Dingle*, 480 F.3d at 1099. Likewise, a reasonable jurist could conclude that Mr. Fox failed to show that the court would have granted a continuance had it been requested on August 15 rather than August 18. Indeed, given the reasons the court offered for denying a continuance—"the age of the case, the number of previously scheduled trial dates, and the fact that [Mr. Fox] fled the jurisdiction"—it appears unlikely that the court would have agreed to continue the trial if the request had been made three days earlier. (Doc. 11-2, Ex. 30, at 12). Because the state

postconviction court reasonably applied *Strickland* in rejecting this claim, Ground Five is denied.

### H.    Ground Six—Failure to Prepare Insanity Defense

Mr. Fox contends that trial counsel was ineffective for failing to "arrange for a psychological evaluation" until after trial. (Doc. 1 at 17-18). As Mr. Fox concedes, counsel eventually obtained such an evaluation and presented it at sentencing. (Doc. 10 at 15). The evaluation revealed that Mr. Fox suffered from bipolar disorder, PTSD, and adjustment disorder. (*Id.*) According to Mr. Fox, had counsel secured a psychological evaluation before trial, his "mental health issues could have been used to argue that [he] was insane at the time of the offense and there[fore], not criminally liable." (Doc. 1 at 18). Mr. Fox also maintains that this information could have been "present[ed] . . . to the State to assist in possibly negotiating a plea offer." (*Id.*)

The state postconviction court rejected this claim. First, it held that Mr. Fox "faile[d] to show" that "a potential insanity defense" was "viable." (Doc. 11-2, Ex. 30, at 14). The court noted that Mr. Fox "planned the bank robbery like a military operation and carried out the plan." (*Id.*) It also pointed out that, during sentencing, the trial court expressed skepticism about an insanity defense. (*Id.*) Specifically, the trial court stated:

> And about the insanity defense, he took the stand and explained very clearly in no uncertain terms that he knew exactly what he was doing, that he planned this robbery out, that he planned it for several days, at this particular bank, that he cased out the bank for several days for the perfect opportunity to go in and commit this robbery.
>
> He planned it out like a military operation and he explained that very clearly. So I think his testimony negates that pitch that you could have had [] an insanity defense.

(*Id.* (citation omitted)). Citing Mr. Fox's trial testimony, the state postconviction court found it "clear" that "an insanity defense at trial was not viable." (*Id.*)

Second, the court held that Mr. Fox "fail[ed] to establish prejudice regarding plea negotiations." (*Id.* at 13-14). The court noted that "[t]he initial plea offer [Mr. Fox] was prepared to enter anticipated an open plea with a 30-year cap." (*Id.* at 14). When that deal fell through, "the State offered [Mr. Fox] a global disposition of 22 years in prison with a single 10-year minimum mandatory, when [he] was facing five consecutive life sentences and five consecutive 10-year minimum mandatories." (*Id.*) The court found it "speculative that the State would have made any better plea offer based on a psychological evaluation." (*Id.*)

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Here, the state court found that counsel was not deficient for failing to secure a psychological evaluation before trial because "an insanity defense . . . was not viable" under Florida law. (Doc. 11-2, Ex. 30, at 14). Thus, the state court "already has told us how the issues would have been resolved under Florida state law had [counsel] done what [Mr. Fox] argues [s]he should have done." *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). This Court is bound to defer to that determination. *See Russell v. Fla. Dep't of Corr.*, No. 3:13-cv-519-LAC-EMT, 2015 WL 2338622, at *24 (N.D. Fla. May 13, 2015) ("[T]he state

court has already answered the question of whether Petitioner's organic brain impairment would have provided a viable insanity defense—it would not have. This court must defer to the state court's determination of state law."). Deference aside, for the reasons discussed above in connection with Ground One, the Court agrees that Mr. Fox did not have a viable insanity defense.

In addition, the state court reasonably determined that Mr. Fox's ability to negotiate a plea was not prejudiced by the delay in securing a psychological evaluation. (Doc. 11-2, Ex. 30, at 13-14). There is no evidence that, had the prosecution received an evaluation detailing Mr. Fox's mental-health issues, it would have offered a more favorable plea deal. Indeed, during one pretrial hearing, the prosecutor appeared skeptical about the usefulness of a psychological evaluation, stating that even if Mr. Fox's counsel obtained "the psychological records," "we may still be in a position where that's not going to make a difference because he's got five robberies." (Doc. 11-2, Ex. 12, at 10-11). Mr. Fox's speculation about the possibility of a better plea offer is insufficient to establish prejudice under *Strickland*. *See Bone v. Mahoney*, 66 F. App'x 670, 673 (9th Cir. 2003) (no *Strickland* prejudice where record contained no evidence "that if [petitioner] had undergone a mental evaluation the prosecutor would have relented and offered a plea agreement to the lesser charge with a shorter term of imprisonment"); *Greene v. United States*, No. 1:16-CR-056, 2018 WL 3748420, at *7 (S.D. Ga. July 6, 2018) ("A bald assertion that some sort of other, more favorable plea deal might have been possible fails to establish the requisite prejudice."), *adopted by* 2018 WL 3747452 (S.D. Ga. Aug. 7, 2018).

For these reasons, Ground Six is denied.[4]

## I.    Ground Seven—Failure to "Adequately Represent" Mr. Fox at Sentencing

Finally, Mr. Fox contends that trial counsel performed deficiently at sentencing in two respects. (Doc. 1 at 19-20). First, counsel allegedly failed to provide the court with Mr. Fox's psychological evaluation "until five minutes prior to the sentencing hearing," and neglected to call the author of the evaluation—Dr. Knight—"to testify as a witness about the findings within the report." (*Id.* at 19). Second, counsel allegedly "failed to review" "police reports" related to Mr. Fox's prior arrest on theft charges, leaving her "unprepared" "to explain the circumstances surrounding the arrest in Hillsborough County and the reason that the State agreed to dismiss the other charges and only convict him of the grand theft charge." (*Id.* at 20).

The state postconviction court rejected this claim. It found "nothing in the record reflect[ing]" that "counsel provided [the psychological] report to the [c]ourt five minutes before the sentencing hearing." (Doc. 11-2, Ex. 30, at 20). To the contrary, "[t]he record reflect[ed] that at the start of the sentencing hearing counsel confirmed that the [c]ourt had already received a copy of the report, which the [c]ourt indicated it had." (*Id.*) Thus, "[t]here [was] no indication that the [c]ourt received the report immediately before the sentencing hearing or that the [c]ourt did not have sufficient time to review the document."

---

[4] To the extent that Mr. Fox complains more generally about counsel's alleged lack of preparation for trial, he fails to establish that he was prejudiced by counsel's conduct. And to the extent that Mr. Fox complains about counsel's performance at sentencing, the Court addresses those allegations in its discussion of Ground Seven.

(*Id.*) Indeed, as the state postconviction court pointed out, the trial court "specifically stated" "when announcing sentence": "[I]'ve considered everything. I've listened carefully. I've taken notes. I've paid attention and read the report from Dr. Knight and have considered all of that." (*Id.* (citation omitted)). Moreover, "[i]t [was] mere speculation that presenting Dr. Knight to testify as to the contents of his report would have caused the [c]ourt to give [Mr. Fox] a lesser sentence." (*Id.*) Because "the report was considered in addition to all other factors when sentencing [Mr. Fox]," the court found that Mr. Fox failed to establish either deficient performance or prejudice. (*Id.*)

The court likewise rejected as "mere speculation" Mr. Fox's "claim that counsel was deficient for failing to review [his] prior record from Hillsborough County and that the [c]ourt would have given [him] a lower sentence had counsel done so." (*Id.*) During the sentencing hearing, the prosecutor noted that "back in 2009," Mr. Fox had committed "a grand theft where he broke into a person's home and took tens of thousands of dollars of jewelry." (*Id.*, Ex. 21, at 47-48). Mr. Fox's counsel subsequently "explained" that he had "received a withhold of adjudication on the grand theft charge and that [his] sentence was time served, indicating that the offense was no[t] particularly egregious based on the sentence imposed." (Doc. 11-2, Ex. 30, at 20). The state postconviction court quoted the trial court's explanation of its sentence:

> And so, now we are here for sentencing. It is a very serious crime. He bonded out just a few days before we were set for trial on this case and then fled the jurisdiction. He had to be located. He had to be extradited from South Carolina. It took years to go to trial on this case.
>
> And so, now here we are and it's been a long time coming for justice for the community and for the citizens of Pinellas County. There's no question Mr.

Fox is a threat to the community, a danger to the community. Absolutely no question of that based on his actions and his meticulous planning of the offense.

So I just don't agree with the position that the defense has presented. I don't agree that this is anywhere near a bottom of the guidelines case. It's clearly not. It's a very violent offense. It's punishable by life in prison and there's a good argument that that's the appropriate sentence.

So, Mr. Fox, the jury having found you guilty of robbery on count one, I adjudicate you guilty, sentence you to 30 years in the Department of Corrections. There's a 10-year minimum mandatory sentence imposed. That's encompassed within the 30 years.

(*Id.* at 21 (citation omitted)). Citing this portion of the transcript, the state postconviction court found that the trial court "based [Mr. Fox's] sentence on the facts of [the] present case and not on his Hillsborough County case." (*Id.*) Thus, the court concluded, Mr. Fox "fail[ed] to demonstrate that counsel was deficient or that he was prejudiced." (*Id.*)

The state postconviction court acted reasonably in rejecting this claim. It found "no indication" in the record that the trial court had "received the report" only five minutes before sentencing. (*Id.* at 20). That factual finding is "presumed correct until rebutted by 'clear and convincing evidence.'" *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022) (quoting 28 U.S.C. § 2254(e)(1)). Mr. Fox offers no basis—much less clear and convincing evidence—to overcome this presumption of correctness. Indeed, the state postconviction court's factual finding is supported by the record, in particular the trial court's statement that it had "read the report from Dr. Knight and [] considered all of that." (Doc. 11-2, Ex. 30, at 20 (citation omitted)). Mr. Fox likewise fails to explain how the outcome of his sentencing would have been different had Dr. Knight testified in person about his findings. In these circumstances, the state postconviction court reasonably

concluded that counsel did not perform deficiently in her presentation of the psychological evaluation at sentencing.

Nor did the state court act unreasonably in finding that Mr. Fox was not prejudiced by his counsel's alleged failure to review his arrest record. The trial court gave a detailed explanation of its decision to impose a thirty-year sentence. That explanation did not contain any mention of Mr. Fox's criminal history. (Doc. 11-2, Ex. 21, at 54-56). Instead, it primarily reflected the court's assessment that the robbery of the PNC Bank was "a very serious crime" that established Mr. Fox as "a threat to the community, a danger to the community." (*Id.* at 55). Thus, the state postconviction court reasonably determined that the trial court "based [Mr. Fox's] sentence on the facts of [the] present case and not on his Hillsborough County case." (*Id.*, Ex. 30, at 21). In light of that finding, there is no basis to conclude that Mr. Fox was prejudiced by counsel's alleged failure to review the "police reports" related to his prior arrest.[5]

For all of these reasons, Ground Seven is denied.[6]

Accordingly, the Court **ORDERS**:

---

[5] In any event, Mr. Fox does not explain how an account of the "circumstances surrounding the arrest in Hillsborough County" would have persuaded the trial court to impose a lower sentence. (Doc. 1 at 20). Indeed, his petition contains no mitigating information about the prior arrest that could have been presented to the trial court. For that reason as well, Mr. Fox fails to show prejudice from counsel's alleged failure to review the police reports.

[6] Mr. Fox seeks an evidentiary hearing on his claims. (Doc. 1 at 24). The Court concludes that an evidentiary hearing is not warranted. *See Schriro*, 550 U.S. at 474 (stating that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing"); *Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record.").

1. Mr. Fox's petition (Doc. 1) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. Fox and to **CLOSE** this case.

3. Mr. Fox is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Fox must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Fox has not made the requisite showing. Because Mr. Fox is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on December 13, 2023.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE